ROBERT DeMARTINO and ELIZABETH DeMARTINO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT E. McDONNELL and ELAINE C. McDONNELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Martino v. Commissioner
Docket Nos. 6351-81, 6352-81.[1]
United States Tax Court
T.C. Memo 1986-263; 1986 Tax Ct. Memo LEXIS 344; 51 T.C.M. (CCH) 1278; T.C.M. (RIA) 86263; June 30, 1986. Jules Ritholz and James C. Sherwood, for the petitioners. Kendall C. Jones and Lawrence M. Hill, for the respondent. KORNER
*346 MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in Federal income tax and additions to tax against petitioners Robert DeMartino, Elizabeth DeMartino, Robert E. McDonnell, and Elaine C. McDonnell as follows: Tax Year
Additions to Tax
Petitioners
Docket No.
Ended
Deficiency
Sec. 6653(a) [2]
Robert DeMartino and
6351-81
12/31/75
$1,475,067.10
$73,753.36
Elizabeth DeMartino
Robert E. McDonnell and
6352-81
12/31/75
1,477,955.30
73,897.77
Elaine C. McDonnell
By amended answers filed January 22, 1985, in docket Nos. 6351-81 and 6352-81, respondent claimed additional amounts of interest against petitioners pursuant to section 6621(d). After concessions, the issues remaining for decision are: (1) Whether petitioners' investment in a crude oil straddle for the taxable year ended December 31, 1975, was a prearranged sham devoid of the requisite economic substance, and if not, whether *347 said investment satisfied the "entered into for profit" requirement of section 108 of the Tax Reform Act of 1984; [3] (2) whether petitioners are liable for additional interest under section 6621(d); (3) whether petitioners are liable for additions to tax pursuant to section 6653(a); and (4) whether petitioner Elizabeth DeMartino or petitioner Elaine McDonnell, or both, are entitled to relief from liability in accordance with the provisions of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. General Background
Petitioners Robert DeMartino and Elizabeth DeMartino, husband and wife, resided in Bedford Hills, New York, at the time the petition in docket No. 6351-81 was filed. For the 1975 calendar year, the DeMartinos filed a joint Federal income tax return using the cash method of accounting. Mrs. DeMartino was a full-time homemaker during the year in issue, and was entirely dependent upon her husband for support. Her participation in the family business affairs *348 was limited to paying the various household bills. To perform this task, her husband would periodically deposit money into her checking account. She was a high school graduate who had no knowledge of the commodity futures trading business. Mrs. DeMartino did not read or sign the 1975 income tax return. Petitioners Robert McDonnell and Elaine McDonnell were husband and wife, residing in Cliffside Park, New Jersey, at the time that the petition was filed in docket No. 6352-81. For the 1975 calendar year, the McDonnell's filed a joint Federal income tax return using the cash method of accounting. During the year in issue, Mrs. McDonnell was a housewife, whose support was provided by her husband. She did not participate in the family's business affairs during this time, other than to pay the usual family related expenses. As with Mrs. DeMartino, Mrs. McDonnell was provided a household allowance to take care of these bills. Mrs. McDonnell was a high school graduate who had no knowledge of commodity futures trading. She did not review the 1975 income tax return. The McDonnells separated in 1978, and were divorced in 1981. Neither the DeMartinos nor the McDonnells made any lavish *349 or unusual expenditures during 1975. Their life styles remained relatively unchanged during that year. There were no expenditures, for example, for extravagant gifts, extensive vacations, or country club memberships, and the children of each family continued to attend public schools. Robert DeMartino (hereinafter "DeMartino") began working in the commodities area as a board boy in 1955, at the age of 18. He continued to work in commodities and eventually became a member of the New York Mercantile Exchange in the late 1960's. He has traded commodities as his primary occupation ever since. Robert McDonnell (hereinafter "McDonnell") began working in commodities in 1956, at the age of 16. He began trading commodities in 1961, on the New York Produce Exchange, and has continued to trade in commodities as his primary occupation through the present time. In December 1970, DeMartino and McDonnell formed Commodity International ("CI"), a partnership, with each acquiring a 50 percent ownership interest. The primary purpose of CI was to buy and sell stocks and commodities for its customers, as well as for its own account. CI has traded in a broad range of commodities, including crude *350 oil, metals, grains, cocoa, sugar, and soybeans. It has traded on all of the New York and Chicago commodity exchanges and on certain London exchanges. CI was a member of the National Futures Association and was registered with the Commodities Futures Trading Commission. During 1975, it was a clearing member of, inter alia, the Commodity Clearing Corporation, the clearing house which cleared all trades on the New York Cotton Exchange ("NYCE"). CI, DeMartino, and McDonnell were commodity traders and persons regulawrly engaged in investing in futures contracts for the taxable year in issue. The deficiencies in the instant cases relate solely to the tax consequences of the following straddle [4] transaction which was executed at the NYCE: Name
Established
Liquidated
Crude Oil Straddle
September 17, 1975
January 21, 1976
General Elements of Commodity Futures Trading
Trading of commodity futures contracts takes place in socalled trading pits or trading rings on the floor of the NYCE. [5] The trades are required to take place by "open outcry," which means that the trades are effected inside the ring by vocal expressions and *351 ritualized hand signals indicating the position (long or short), quantity, and price at which the floor broker or trader is willing to trade. Although a price, month, and quantity are established and agreed to by a buyer and a seller, futures contracts are not bilateral between these two individuals. Rather, once cleared, the contract exists only between the buyer or the seller on the one side and the clearing house for the exchange on the other. The clearing house stands as the buyer to every seller, and the seller to every buyer. It is the entity connected with the exchange through which all futures contracts are made, offset, [6] and through which the futures obligations of clearing members are fulfilled through delivery. The floor broker or trader who executes the trade does not normally learn the name of the opposite customer during the course of the trade. *352 A straddle position is established by simultaneously holding a long position (a contract to buy) in one delivery month and a short position (a contract to sell) in another delivery month, with respect to the same commodity. [7] For example, if one buys a contract in March 1976 crude oil and sells a contracts in June 1976 crude oil, one has established a straddle, long March crude and short June crude. The two separate delivery months are called the legs of the straddle. The profit or loss potential of a straddle is not based on absolute price movements in the legs, but rather, is measured by the increase or decrease in the price differential between the long and short contracts. For example, in a rising market, a short position loses value and a long position gains value. If, after a day's trading, the loss on the short precisely equals the gain on the long, the differential *353 will be unchanged and the value of the position will be unchanged. If, however, the short loses more value than the long gains, the differential will change and the value of the entire straddle position will diminish. [8]
*354 Trading in commodities futures contracts has been regulated since April 1975 by the Commodity Future Trading Commission. This independent Federal regulatory agency was established in 1974 by the Commodity Futures Trading Act of 1974. It was organized primarily to provide regulations dealing with the specific problems relating to commodity markets. The Crude Oil Futures Market
Trading of crude oil futures contracts at the NYCE began on September 10, 1974, and ceased on July 2, 1976. Bids, offers, and transaction prices for crude oil futures were reported over the standard electronic network utilized by brokerage houses, as well as on a daily basis in the financial press. Thus, investors and their brokers throughout the United States had access to reports of all of the prices established in the crude oil ring. A NYCE crude oil futures standard contract specified 5,000 barrels of crude oil for future delivery at Rotterdam, Holland. Four delivery months were utilized: March, June, September, and December. The NYCE Crude Oil Market was thinly traded throughout its life, with relatively few traders and a relatively low volume of contracts traded. Only about 55,000 trades *355 were executed in the market, and of these, approximately 37,000 were straddle trades. There was virtually no trading in the nearby months in the Crude Oil Market, which are typically actively traded months during the life of a commodity futures contract. The Crude Oil Market was established by the Petroleum Associates of the NYCE. The Petroleum Associates was one of several "sub-exchanges" of the NYCE. All members of the NYCE could trade on all of the NYCE sub-exchanges. One of the functions of the Petroleum Associates was to provide rules governing trading in crude oil futures contracts. Pertinent provisions of these rules, are as follows: Rule C14. (5) * * * No transaction that is not made competitively by open outcry in the trading ring of the Exchange shall be permitted, reported or recorded in the records of transactions, except (a) transfers of open contracts of a clearing member or member firm necessitated by the death of the only member of such firm who had held membership in the Exchange; (b) transfers of open contracts of a client, made at the request of such client, from one member to another member; (c) transfers of open contracts of a client at the request of *356 the original carrying member to another member; (d) transfers of futures contracts in exchange for Crude Oil. Any transfers of contracts made under (a), (b) or (c) of this paragraph which involves a change in ownership is prohibited. * * * * * * Rule C14. (15) Members of this Exchange are permitted to execute orders to purchase one future and to sell another future at a stated price difference, such trade to be known as a "straddle" transaction and to be for the account of one customer except in the case of a transfer of interest in a commercial transaction. These orders are to be executed competitively by public outcry in the ring with at least one side of the straddle at the market price prevailing at the time of the trade. In inactive futures in which there are no prevailing market prices because there have been no trades, bids or offers in either future, the price must bear a reasonable relationship to the prevailing market prices of active futures. * * * * * * Rule C27. A member of the Exchange who shall have in hand at the same time both buying and selling orders of different principals for Crude Oil for future delivery in the same delivery month may execute such *357 orders for and directly between such principals at the market price, if, in conformity with the following conditions: (1) Such orders are first offered openly and competitively by open outcry in the trading ring (a) by both bidding and offering at the same price, and neither such bid nor offer is accepted, or (b) by bidding and offering to a point where such offer is higher than such bid by not more than one one-tenth of a cent, and neither such bid nor offer is accepted; (2) Such member executes such orders in the presence of an official representative of the Exchange designated to observe such transactions and, by appropriate descriptive words or symbol, clearly identifies all such transactions on his trading card or other similar record, made at the time of execution, and notes thereon the exact time of execution, and promptly presents said record to such official representatives for verification and initialing; (3) Such transactions are duly reported, recorded and cleared in the same manner as other orders executed on the Exchange; (4) The Exchange keeps a permanent record of each such transaction showing the date, price, quantity of Crude Oil, delivery month, by whom *358 executed, and the exact time of execution; and (5) Neither the futures commission merchant receiving nor the member executing such orders has any interest therein, directly or indirectly, except as a fiduciary. The rules did not provide whether it was proper or improper to solicit customers outside of the trading rings. The Crude Oil Straddle
The Crude Oil Straddle was established by CI on September 17, 1975, and concluded on January 21, 1976. The straddle consisted of a series of straddle trades, the specifics of which are depicted by the following table: Table No. 1
The Crude Oil Straddle 1975 through 1976
Contracts Traded: Long or (Short)
June
Sept
Dec
Mar
June
Sept
CI's
Trade
Date
Price
1977
1977
1977
1978
1978
1978
Broker
A.
09-17-75
9.850
(50)
HAMILTON
9.855
(50)
HAMILTON
9.850
(50)
HAMILTON
9.770
50
HAMILTON
9.775
50
HAMILTON
9.770
50
HAMILTON
Position
(150)
150
B.
09-18-75
9.850
(150)
HAMILTON
9.852
(59)
HAMILTON
9.855
(41)
HAMILTON
9.770
150
HAMILTON
9.772
59
HAMILTON
9.775
41
HAMILTON
Position
(400)
400
C.
12-04-75
12.160
150 HAMILTON
12.170
63 HAMILTON
12.180
150 HAMILTON
11.940
(150)
HAMILTON
11.950
(63)
HAMILTON
11.960
(150)
HAMILTON
Position
(37)
400
(363)
*359 Table No. 1
The Crude Oil Straddle 1975 through 1976
Contracts Traded: Long or (Short)
1975
Opposite
Opposite
Opposite
Short-Term
Trade
Date
Price
Broker
Firm
Customer
Gain (Loss)
A.
09-17-75
9.850
CONLIN
HARRIS UPHAM
RITTENBERRY
9.855
CONLIN
HARRIS UPHAM
RITTENBERRY
9.850
CONLIN
HARRIS UPHAM
RITTENBERRY
9.770
CONLIN
HARRIS UPHAM
RITTENBERRY
9.775
CONLIN
HARRIS UPHAM
RITTENBERRY
9.770
CONLIN
HARRIS UPHAM
RITTENBERRY
Position
B.
09-18-75
9.850
CONLIN
HARRIS UPHAM
RITTENBERRY
9.852
CONLIN
HARRIS UPHAM
RITTENBERRY
9.855
KNELL
HARRIS UPHAM
RITTENBERRY
9.770
CONLIN
HARRIS UPHAM
RITTENBERRY
9.772
CONLIN
HARRIS UPHAM
RITTENBERRY
9.775
NKELL
HARRIS UPHAM
RITTENBERRY
Position
C.
12-04-75
12.160
HAMILTON
GENORA
PRESSNER
($1,731,250.00)
12.170
HAMILTON
GENORA
PRESSNER
($730,110.00)
12.180
HAMILTON
GENORA
PRESSNER
($1,747,500.00)
11.940
HAMILTON
GENORA
PRESSNER
11.950
HAMILTON
GENORA
PRESSNER
11.960
HAMILTON
GENORA
PRESSNER
Position
1975 Grand Total
* ($4,208,860.00)
*360 June
Sept
Dec
Mar
June
Sept
CI'S
Trade
Date
Price
1977
1977
1977
1978
1978
1978
Broker
D.
01-12-76
12.025
(20)
HAMILTON
12.026
(20)
HAMILTON
12.027
(20)
HAMILTON
11.950
20 HAMILTON
11.950
20 HAMILTON
11.950
20 HAMILTON
Position
(37)
340 (303)
E.
01-13-76
12.100
(15)
HAMILTON
12.150
(15)
HAMILTON
12.200
(15)
HAMILTON
12.200
(15)
HAMILTON
12.030
15 HAMILTON
12.068
15 HAMILTON
12.123
15 HAMILTON
12.125
15 HAMILTON
Position
(37)
280 (243)
F.
01-14-76
12.200
14 HAMILTON
12.215
7 HAMILTON
12.239
2 HAMILTON
12.240
14 HAMILTON
12.110
(14)
HAMILTON
12.130
(7)
HAMILTON
12.150
(16)
HAMILTON
Position
0 243
(243)
G.
01-16-76
12.150
(20)
HAMILTON
12.176
(10)
HAMILTON
12.200
(5)
HAMILTON
12.202
(5)
HAMILTON
12.202
(20)
HAMILTON
12.075
20 HAMILTON
12.100
10 HAMILTON
12.125
5 HAMILTON
12.125
5 HAMILTON
12.125
20 HAMILTON
Position
0 183 (183)
H.
01-19-76
12.075
(20)
HAMILTON
12.097
(10)
HAMILTON
12.100
(20)
HAMILTON
12.104
(10)
HAMILTON
12.000
20 HAMILTON
12.020
20 HAMILTON
12.025
10 HAMILTON
12.030
10 HAMILTON
Position
0 123
(123)
I.
01-20-76
12.140
(16)
HAMILTON
12.150
(16)
HAMILTON
12.170
(6)
HAMILTON
12.180
(6)
HAMILTON
12.190
(16)
HAMILTON
12.070
16 HAMILTON
12.075
16 HAMILTON
12.100
6 HAMILTON
12.100
6 HAMILTON
12.110
16 HAMILTON
Position
0 63 (63)
J.
01-21-76
12.061
(4)
HAMILTON
12.075
(8)
HAMILTON
12.075
(33)
HAMILTON
12.076
(1)
HAMILTON
12.077
(1)
HAMILTON
12.081
(16)
HAMILTON
11.980
4 HAMILTON
12.000
16 HAMILTON
12.000
8 HAMILTON
12.000
35 HAMILTON
Position
0 0 0 *361 1976
Opposite
Opposite
Opposite
Short-Term
Trade
Date
Price
Broker
Firm
Customer
Gain (Loss)
D.
01-12-76
12.025
HAMILTON
GENORA
PRESSNER
12.026
HAMILTON
GENORA
PRESSNER
12.027
HAMILTON
GENORA
PRESSNER
11.950
HAMILTON
GENORA
PRESSNER
11.950
HAMILTON
GENORA
PRESSNER
11.950
HAMILTON
GENORA
PRESSNER
($46,950.00)
Position
Subtotal
($46,950.00)
E.
01-13-76
12.100
HAMILTON
GENORA
PRESSNER
12.150
HAMILTON
GENORA
PRESSNER
12.200
HAMILTON
GENORA
PRESSNER
12.200
HAMILTON
GENORA
PRESSNER
$1,394,050.00 12.030
HAMILTON
GENORA
PRESSNER
12.068
HAMILTON
GENORA
PRESSNER
12.123
HAMILTON
GENORA
PRESSNER
12.125
HAMILTON
GENORA
PRESSNER
Position
Subtotal
$1,394,050.00 F.
01-14-76
12.200
HAMILTON
GENORA
PRESSNER
12.215
HAMILTON
GENORA
PRESSNER
12.239
HAMILTON
GENORA
PRESSNER
12.240
HAMILTON
GENORA
PRESSNER
($437,540.00)
12.110
HAMILTON
GENORA
PRESSNER
12.130
HAMILTON
GENORA
PRESSNER
12.150
HAMILTON
GENORA
PRESSNER
$436,050.00 Position
Subtotal
($1,490.00)
G.
01-16-76
12.150
CONLIN
HARRIS UPHAM
RITTENBERRY
12.176
CONLIN
HARRIS UPHAM
RITTENBERRY
12.200
HAMILTON
GENORA
PRESSNER
12.202
HAMILTON
GENORA
PRESSNER
12.202
CONLIN
HARRIS UPHAM
RITTENBERRY
$723,050.00 12.075
CONLIN
HARRIS UPHAM
RITTENBERRY
12.100
CONLIN
HARRIS UPHAM
RITTENBERRY
12.125
HAMILTON
GENORA
PRESSNER
12.125
HAMILTON
GENORA
PRESSNER
12.125
CONLIN
HARRIS UPHAM
RITTENBERRY
($47,750.00)
Position
Subtotal
$675,300.00 H.
01-19-76
12.075
CONLIN
HARRIS UPHAM
RITTENBERRY
12.097
CONLIN
HARRIS UPHAM
RITTENBERRY
12.100
CONLIN
HARRIS UPHAM
RITTENBERRY
12.104
CONLIN
HARRIS UPHAM
RITTENBERRY
$696,550.00 12.000
CONLIN
HARRIS UPHAM
RITTENBERRY
12.020
CONLIN
HARRIS UPHAM
RITTENBERRY
12.025
CONLIN
HARRIS UPHAM
RITTENBERRY
12.030
CONLIN
HARRIS UPHAM
RITTENBERRY
($18,400.00)
Position
Subtotal
$678,150.00 I.
01-20-76
12.140
CONLIN
HARRIS UPHAM
RITTENBERRY
12.150
CONLIN
HARRIS UPHAM
RITTENBERRY
12.170
HAMILTON
GENORA
PRESSNER
12.180
HAMILTON
GENORA
PRESSNER
12.190
CONLIN
HARRIS UPHAM
RITTENBERRY
$717,530.00 12.070
CONLIN
HARRIS UPHAM
RITTENBERRY
12.075
CONLIN
HARRIS UPHAM
RITTENBERRY
12.100
HAMILTON
GENORA
PRESSNER
12.100
HAMILTON
GENORA
PRESSNER
12.110
CONLIN
HARRIS UPHAM
RITTENBERRY
($38,400.00)
Position
Subtotal
79,130.00 J.
01-21-76
12.061
HAMILTON
GENORA
PRESSNER
12.075
HAMILTON
GENORA
PRESSNER
12.075
CONLIN
HARRIS UPHAM
RITTENBERRY
12.076
CONLIN
HARRIS UPHAM
RITTENBERRY
12.077
CONLIN
HARRIS UPHAM
RITTENBERRY
12.081
CONLIN
HARRIS UPHAM
RITTENBERRY
$725,045.00 11.980
HAMILTON
GENORA
PRESSNER
12.000
CONLIN
HARRIS UPHAM
RITTENBERRY
12.000
HAMILTON
GENORA
PRESSNER
12.000
CONLIN
HARRIS UPHAM
RITTENBERRY
($12,200.00)
Position
Subtotal
$712,845.00 1976 Grand Total
* $4,091,035.00 *362 As Table No. 1 indicates, CI limited the contracts it traded to the following delivery months; June 1977, December 1977, and March 1978. As the Table also indicates, as a result of its trades, CI claimed a short-term capital loss of $4,208,860 on its 1975 U.S. Partnership Income Tax Return, and a short-term capital gain of $4,091,835 on its 1976 return. Clearing records for the Commodity Clearing Corporation, the clearing house at the NYCE, indicate that a 25-contract ex-pit transaction [9] for CI, cleared on September 30, 1975. The Crude Oil Straddle consisted primarily of two straddles, a June 1977-December 1977 straddle, and a December 1977-March 1978 straddle. The settlement prices for the delivery months and straddle differentials involved in these two straddles, for each day of trading during the life of the Crude Oil Straddle, are depicted by the following table: Table No. 2
The Crude Oil Straddle: Settlement Prices
A. The June-December Straddle
1975
Price
Differ-
Date
Jun 77
Dec 77
ential
Sept.
17
$10.080
$10.000
$ .080
18
10.080
10.000
.080
19
10.090
10.010
.080
22
10.080
10.000
.080
23
10.090
10.000
.090
24
10.090
10.010
.080
25
10.140
10.060
.080
26
10.350
10.270
.080
29
10.600
10.520
.080
30
10.850
10.770
.080
Oct.
1
10.930
10.850
.080
2
11.030
10.950
.080
3
10.970
10.890
.080
6
11.220
11.140
.080
7
11.470
11.390
.080
8
11.720
11.640
.080
9
11.700
11.620
.080
10
11.680
11.600
.080
14
11.610
11.530
.080
15
11.620
11.540
.080
16
11.610
11.530
.080
17
11.570
11.490
.080
20
11.750
11.670
.080
21
11.860
11.780
.080
22
12.070
11.990
.080
23
12.190
12.110
.080
24
12.280
12.200
.080
27
12.310
12.230
.080
28
12.300
12.220
.080
29
12.420
12.340
.080
30
12.500
12.420
.080
31
12.480
12.400
.080
Nov.
3
12.465
12.385
.080
5
12.455
12.375
.080
6
12.450
12.370
.080
7
12.500
12.420
.080
10
12.490
12.410
.080
11
12.505
12.425
.080
12
12.470
12.390
.080
13
12.510
12.430
.080
14
12.490
12.410
.080
17
12.480
12.400
.080
18
12.480
12.400
.080
19
12.460
12.380
.080
20
12.570
12.490
.080
21
12.560
12.480
.080
24
12.550
12.470
.080
25
12.540
12.460
.080
26
12.480
12.400
.080
28
12.420
12.340
.080
Dec.
1
$12.360
$12.280
$ .080
2
12.120
12.040
.080
3
11.940
11.860
.080
4
11.970
11.890
.080
5
11.770
11.690
.080
8
11.530
11.450
.080
9
11.280
11.200
.080
10
11.140
11.060
.080
11
10.940
11.860
.080
12
10.940
10.860
.080
15
10.940
10.860
.080
16
10.980
10.900
.080
17
11.220
11.140
.080
18
11.400
11.320
.080
19
11.530
11.450
.080
22
11.700
11.620
.080
23
11.950
11.870
.080
24
11.980
11.900
.080
29
12.030
11.950
.080
30
11.950
11.870
.080
31
12.000
11.920
.080
1976
Date
Jan.
2
12.040
11.960
.080
5
12.120
12.040
.080
6
12.150
12.070
.080
7
12.130
12.050
.080
8
12.100
12.020
.080
9
12.140
12.060
.080
12
12.170
12.090
.080
13
12.230
12.150
.080
14
12.200
12.120
.080
15
12.180
12.100
.080
16
12.210
12.130
.080
19
12.245
12.165
.080
20
12.230
12.150
.080
21
12.200
12.120
.080
*363 B. The December-March Straddle
1975
Price
Differ-
Date
Dec 77
Mar 78
ential
Dec.
4
11.890
$11.750
$ .140
5
11.690
11.550
.140
8
11.450
11.310
.140
9
11.200
11.060
.140
10
11.060
10.920
.140
11
11.860
10.710
.150
12
10.860
10.720
.140
15
10.860
10.720
.140
16
10.900
10.760
.140
17
11.140
11.000
.140
18
11.320
11.180
.140
19
11.450
11.310
.140
22
11.620
11.480
.140
23
11.870
11.730
.140
24
11.900
11.760
.140
29
11.950
11.810
.140
30
11.870
11.730
.140
31
11.920
11.780
.140
1976
Date
Jan.
2
11.960
11.820
.140
5
12.040
11.900
.140
6
12.070
11.930
.140
7
12.050
11.910
.140
8
12.020
11.880
.140
9
12.060
11.920
.140
12
12.090
11.950
.140
13
12.150
12.010
.140
14
12.120
11.980
.140
15
12.100
11.960
.140
16
12.130
11.990
.140
19
12.165
12.025
.140
20
12.150
12.010
.140
21
12.120
11.980
.140
Table No. 2 shows that the price of a June 1977 contract ranged from $10.080, on several dates, including September 17, 1975, to $12.570 on November 20, 1975. *364 The price of a December 1977 contract ranged from $10.000, on several dates, including September 17, 1975, to $12.490 on November 20, 1975. The straddle differential for the June-December straddle, however, was a constant $ .080 throughout the life of this straddle, with the exception of September 23, 1975, when the differential was $ .090. The price of a March 1978 contract hit a low of $10.710 on December 11, 1975, and a high of $12.025 on January 19, 1976. The straddle differential for the December-March straddle was $ .220 on each day this straddle was maintained, with the exception of December 11, 1975, when the differential was $ .230. Neither DeMartino nor McDonnell entered the floor of the NYCE during the time the Crude Oil Straddle was maintained. Instead, they placed orders through CI's order room. After an order was placed, the order clerks would then contact one of CI's floor clerks at the NYCE. The floor clerk, in turn, would deliver the order to the crude oil trading pit, where the trade was executed. After the trade was completed, CI's order clerk would learn the name of the floor broker who executed the trade on CI's behalf, thereby facilitating CI in determining *365 who would receive the resulting floor brokerage commission. The Participants
Joseph R. Hamilton became a full-time commodity futures floor broker in 1969, and continued in this occupation through 1976. During this period he was a member of several exchanges, including the NYCE. At the NYCE, he traded as a broker for about a dozen brokerage houses and for his own account. Hamilton primarily traded crude oil futures contracts during 1974, 1975, and 1976. He was present in the crude oil ring of the Crude Oil Market at the NYCE on substantially all of the trading days during the life of the market. He executed approximately 98 percent of all of the crude oil trades occurring in the market, and was often the floor broker for both sides of a transaction. He also determined the daily settlement prices for the crude oil contracts, and was a member of the board of directors of the Petroleum Associates. As is indicated in Table No. 1, supra, Hamilton was CI's broker on each of the 77 trades involved in the Crude Oil Straddle. He was also the opposing broker on 39 or approximately 51 percent of these trades. CI's employment records reflect that Hamilton's son, Marshall, *366 opened a trading account with CI on April 25, 1975, and that on May 22, 1975, Marshall applied for a position as an associated person with CI. During March 1977, Hamilton left the United States and moved to Switzerland. He has resided in Switzerland since that time. In the latter part of 1977, Hamilton was contacted in Switzerland by a representative of the New York District Attorney's office, concerning whether he would cooperate with respect to an investigation of the Crude Oil Market. Hamilton agreed to cooperate in exchange for both Federal and State immunity from prosecution. The Federal immunity agreement specifically provided that the United States would not prosecute Hamilton for any crimes committed prior to January 1, 1978, on the NYCE, as well as for any tax offenses. Norman A. Turkish began working as a security and commodity trader in 1960, and continued in that line for the next 25 years. Turkish began specializing in commodity futures trading in 1970, while he was a limited partner at the brokerage firm of Bear, Stearns, and Company. He was a member of the board of directors of the Petroleum Associates during the year in issue. Turkish first became acquainted *367 with McDonnell in 1970. He was a frequent source of investment advice to McDonnell and CI throughout the 1970-1975 period, and CI's investment in the Crude Oil Straddle was based at least partially on the advice of Turkish. Turkish was also acquainted with Hamilton, and spoke frequently with him during the time the Crude Oil Straddle was maintained. Alfred Perlmutter worked as an assistant to Turkish from 1968 through 1978. Prior to 1968, Perlmutter worked at various other jobs related to commodity futures trading. As Turkish's assistant, Perlmutter kept records, spoke with customers, did research, and dealt with other office problems. Hamilton, Turkish, Perlmutter, and others controlled virtually the entire Crude Oil Market at the NYCE. Turkish, with the help of Perlmutter, decided prior to the day of trading, the volume and prices of the crude oil contracts to be traded in the market for that particular day, so as to artificially create gains and losses for tax purposes. These prearranged trades were then executed by Hamilton in the crude oil ring. Since Hamilton was usually the only broker in the ring, he was able to manipulate the prices of the contracts traded to achieve *368 the profits or losses requested by Turkish. The CI trades in issue were prearranged in the above manner, thus, avoiding the risks normally associated with commodities futures markets. The Crude Oil Straddle at issue herein was not a bona fide transaction executed in a competitive open market. OPINION I. The Sham Issue
The first issue for decision is whether the straddle trades involved in the Crude Oil Straddle, for the taxable year ended December 31, 1975, were prearranged shams which should not be recognized for Federal tax purposes. [10]
Petitioners argue that the trades were properly executed, that they cleared in the normal course of trading, and that they were executed at market prices, prices which were widely publicized by the various reporting services. They argue that the trades were not *369 prearranged and that the trades could not have been executed at anything but market prices, because otherwide, there would have been a surge of investors entering the market, attempting to capitalize on profit opportunities. Respondent, on the other hand, contends that the trades were in fact prearranged, that they did not take place at market prices, and that, accordingly, the tax consequences of the trades cannot be considered. We agree with respondent. Section 165(a) allows a deduction for a loss sustained during the taxable year that is not compensated for by insurance or otherwise. In the case of an individual, the deduction is limited to either: losses incurred in a trade or business, losses incurred in a transaction entered into for profit, or losses resulting from theft or some other casualty. Sec. 165(c). In addition, to be deductible, the claimed loss must be the result of a bona fide transaction, and substance not mere form shall be the controlling factor. Sec. 1.165-1(b), Income Tax Regs.; Brown v. Commissioner,85 T.C. 968, 998 (1985). *370 See Gregory v. Helvering,293 U.S. 465 (1935). Alleged transactions involving commodity futures contracts which are not in fact bona fide will not be recognized for Federal tax purposes. Perlin v. Commissioner,86 T.C. 388 (1986). See United States v. Winograd,656 F.2d 279, 281 (7th Cir. 1981), cert. denied sub nom. Siegel v. United States,455 U.S. 989 (1982); Brown v. Commissioner,supra;Forseth v. Commissioner,85 T.C. 127 (1985), on appeal (5th Cir. Feb. 4, 1986; 6th Cir. Feb. 4, 1986; 7th Cir. Feb. 4, 1986; 9th Cir. Feb. 3, 1986; 11th Cir. Feb. 5, 1986); Miller v. Commissioner,84 T.C. 827 (1985), on appeal (10th Cir., Nov. 20, 1985); Julien v. Commissioner,82 T.C. 492 (1984). Respondent's determination that the underlying transactions are not bona fide is presumptively correct, and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). The facts here are similar to those in United States v. Winograd,supra, where the court indicated *371 that a taxpayer's trading in commodity futures contracts did not support deductible losses because the trades were not bona fide transactions executed in a competitive open market. 656 F.2d at 283. There, as here, though the taxpayers appeared to be utilizing an organized market, they were in fact creating a market for their transactions at prices they established for ulterior purposes. Although our conclusion that the trades did not result from bona fide transactions is based on a careful review of the entire record, we found the following factors, taken together, to be particularly determinative in reaching our result: First. The trades were prearranged. The Commodity Futures Trading Commission ("CFTC") regulations provide that, with limited exceptions, [11] all trading must be executed by competitive open outcry bidding in the trading ring on the floor of the exchange. 17 C.F.R. sec. 1.38(a)(1985). [12] The reasoning behind the open outcry process is to ensure open competitive markets where the first taker gets the trade, and to ensure that *372 the customer is protected since the lowest offer will theoretically be met by the highest bid. See Vernon, "Regulation of Commodities Futures Trading: A Basic Primer," 5 Journal of Agricultural Taxation & Law 125, 141-142 (1983). Here, the trades involved in the Crude Oil Straddle were prearranged outside of the trading ring in contravention of the CFTC regulations. Hamilton, the broker who executed all of CI's trades, testified that the trades were prearranged by himself and Turkish. [13] Hamilton stated that he specifically remembered prearranging the September 17 and 18, 1975, CI transactions, because CI had reached its 400 contract clearing limit on those days. He recalled that because the 400 contract limit had been reached, a 25-contract ex-pit transaction [14] had to be arranged for CI. The clearing records corroborate this testimony *373 in that they indicate that a 25-contract ex-pit was executed shortly after the September 17 and 18 CI trades. [15]
*374 Turkish, who was involved in advising petitioners to enter the Crude Oil Market, testified that none of the CI trades were prearranged. This testimony, however, is simply unreliable. [16]
The one other participant in this scheme who testified at trial, Alfred Perlmutter, stated that the entire Crude *375 Oil Market on the NYCE was prearranged. In fact, Perlmutter pled guilty to fixing, rigging, and prearranging trades, and manipulating the prices of the Crude Oil Market, for the purpose of creating predetermined losses. We accordingly are convinced that the CI trades were prearranged. Second. The trades were not executed at free-market prices. Hamilton, who was involved as a broker on over 98 percent of all of the trades executed in the Crude Oil Market, testified on several occasions that he controlled the market and artificially moved the prices downward. Perlmutter confirmed this testimony and indicated that a market did not exist in the true sense of the term, because all of the trades were prearranged by Turkish. Another indicator that the prices of the contracts in the Crude Oil Market were controlled, was observed by petitioners' expert, Adelaide Blitzer. Blitzer, who carefully reviewed the trading records, testified that on some days the prices of the crude oil contracts would change, despite the fact that no contracts were traded. There is also evidence that the Crude Oil Market did not behave in a manner similar to that of other commodity futures markets. For *376 example, unlike most markets, the vast majority of the trades executed in the Crude Oil Market were executed as straddles. [17] Also, the bulk of trading in the Crude Oil Market did not occur in the nearby months, which is normally a period of active trading. This evidence tends to corroborate the testimony of the witnesses above, since the unusual behavior of the market may have been, and probably was, a result of the controlling forces exerted by the participants. Petitioners, nevertheless, maintain that it was impossible to control the many *377 factors affecting the price of crude oil (such as climate conditions and the impact of political events) and that the crude oil trades must have been consistent with market reality, because no one could prevent traders from entering the market to capitalize on unrealistic prices. Hamilton and Perlmutter stated that they were aware of the possibility of interference by outside investors, but that steps were taken to prevent this possibility from becoming a reality. Hamilton stated that he tried to prevent outside interference by moving the market prices gradually, thus, avoiding any large moves in the contract prices at any one particular time. He indicated that investors were discouraged from entering the market and that, in fact, there never was any outside interference. Perlmutter testified that he regularly cut out newspaper articles involving crude oil which later could be used to justify any irregularities in crude oil futures prices. In short, we are convinced that the record supports the conclusion that the trades were not executed at free-market prices, but at artificial prices, created by the participants for their own purposes. Third. The differential in the Crude *378 Oil Straddle stayed virtually the same throughout the entire life of the straddle. As was stated in Julien v. Commissioner,82 T.C. 492, at 508 (1984): A commodity straddle is held in the expectation of profiting from a change in the "spread" or "premium," the difference in price between two futures contracts. While the price movements of the two contracts will have some relationship to each other, as the prices will be affected by similar economic conditions, neither in theory nor in practice are the fluctuations identical. * * * [quoting R. Dailey, "Commodity straddles in Retrospect: Federal Income Tax Considerations," 47 Brooklyn L. Rev. 313, 321 (Winter, 1981).] In the instant matter (as Table No. 2, supra, indicates) the settlement prices for the straddle differentials in the June-December straddle and the December-March straddle (i.e., the primary components of the Crude Oil Straddle), each varied on only one day throughout the time these straddles were maintained. This fact is even more anomalous when it is compared to: (1) The settlement prices of the June leg of the straddle, which varied from $10.080 to $12.570; (2) the prices *379 of the December legs of the straddles which ranged from $10.000 to $12.490; and (3) the price of the March leg of the straddle, which varied from $10.710 to $12.025. The mystery of the constantly changing prices in the legs of the straddle, as compared with the unvarying prices in the straddle differentials, was explained by the omnipresent Hamilton. It was Hamilton who set the crude oil settlement prices, and as Hamilton explained, it was not only important for the prices of the legs of the straddle to fluctuate, in order to achieve the desired tax results, but it was also important for the settlement prices making up the differential to remain at a constant price, in order to avoid the possibility of margin calls. Thus, we are again presented with evidence that the Crude Oil Straddle was not constrained by the usual risks present in commodity futures markets. Fourth. The Crude Oil Market was a thin market. We are well aware that many legitimate commodity futures markets undergo periods of thinness. However, this fact is significant here because a thin market enabled the participants in this scheme to act in a manner which would not have been tolerated in a market flooded *380 with legitimate investors. As Hamilton testified, he was the only broker continuously in the crude oil ring. It follows that without the threat of outside interference from other brokers, it was much easier for him to move the market to predesignated points. [18]
For all of the foregoing reasons we conclude that any losses to petitioners resulting from the Crude Oil Straddle during the year in issue will not be recognized for Federal tax purposes. [19]
*381 II. Section 6621(d)
The second issue for decision, concerning whether petitioners are liable for additional interest under the provisions of section 6621(d), has already been decided by this Court in Forseth v. Commissioner,T.C. Memo. 1985-279, on appeal (5th Cir. Feb. 4, 1986; 6th Cir. Feb. 4, 1986; 7th Cir. Feb. 4, 1986; 9th Cir. Feb. 3, 1986; 11th Cir. Feb. 5, 1986). Section 6621(d) provides that an increased interest rate shall be applied to any underpayments attributable to "tax motivated transactions" including those involving a "straddle" as the term is defined in section 1092(c). As we indicated in Forseth, a straddle that is fake or fictitious does not fit within the section 1092(c) definition. Here, as we have held, the trades forming the Crude Oil Straddle were not the result of bona fide transactions; thus, as in Forseth, the straddle was not "real" for purposes of section 1092(c). Respondent, nonetheless, insists that although the trades comprising the Crude Oil Straddle were shams, the trades did in fact take place and cleared through normal *382 clearing procedures. As such, argues respondent, the Crude Oil Straddle was a "straddle" as the term is used in section 1092(c). We find respondent's argument to be unpersuasive. Section 1092(c) provides in pertinent part: Straddle Defined.--For purposes of this section-- (1) In General.--The term "straddle" means offsetting positions with respect to personal property. (2) Offsetting Positions.-- (A) In General.--A taxpayer holds offsetting positions with respect to personal property if there is a substantial diminution of the taxpayer's risk of loss from holding any position with respect to personal property by reason of his holding 1 or more other positions with respect to personal property (whether or not of the same kind). [Emphasis added.] Here, the substantial diminution in petitioners' risk did not result by reason of holding offsetting positions in personal property; rather, the risk was eliminated because the Crude Oil Market was rigged and manipulated. The Crude Oil Straddle simply does not fit within the parameters of this definition. Our concern with *383 this seemingly "anomalous" result was expressed in Forseth, wherein we stated: We recognize that our holding means that a real straddle not meeting the requisite profit standard might constitute a "tax motivated transaction" under sec. 6621(d), whereas a purely fictitious "straddle" would not. While this result might seem anomalous, we believe that it is the necessary conseqauences of the absence of such factual sham transactions from the statutory or regulatory definitions of tax motivated transactions, and of the explicit inclusion by Congress, by reference to the definition of "straddle" in sec. 1092(c), of transactions which are straddles not just in form but in substance. [Forseth v. Commissioner,supra at note 6.] Hence, the additional interest provisions of section 6621(d) will not be applied to petitioners in the instant matter. III. Section 6653(a)
The third issue for decision is whether petitioners are liable for additions to tax pursuant to section 6653(a). Section 6653(a) provides that if any part of an underpayment of income tax is due to negligence *384 or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent determined additions to tax for negligence against petitioners relative to their 1975 tax year. As to such determinations, petitioners bear the burden of proving error. Rule 142(a); Enoch v. Commissioner,57 T.C. 781, 802 (1972). Since we have found that the trades involved in the Crude Oil Straddle are not to be recognized for Federal tax purposes, we must next determine whether petitioners knew or had reason to know of this occurrence. DeMartino and McDonnell claim that they did not enter the floor of the NYCE during the time the Crude Oil Straddle was maintained, and that they had no knowledge or reason to know of the sham nature of their transactions. Respondent contends that these petitioners were well aware that the Crude Oil Market was riskless, yet they chose to invest in it anyway. The parties agree that sometime during the first half of 1975, DeMartino, McDonnell, Turkish, and Hamilton met at Fraunce's Tavern, a New York City restaurant and bar often frequented by commodity traders. [20] What transpired at *385 this meeting, however, is a matter of dispute. DeMartino, McDonnell, and Turkish, each testified that the purpose of the meeting was to arrange for the employment of Marshall Hamilton, Joseph Hamilton's son. They stated that CI was interested in having Marshall open and manage a CI branch office in Switzerland. [21] Each of the three also testified that the subject of the Crude Oil Maket was not brought up at the meeting. Joseph Hamilton, contrary to the other witnesses, testified that the purpose of the meeting was to discuss the Crude Oil Market. Hamilton stated that he specifically told DeMartino and McDonnell that straddles could be executed without risk in the Crude Oil Market, because he (i.e., Hamilton) controlled the market. [22]
*386 The self-serving testimony of DeMartino and McDonnell is entitled to little weight, especially where, as here, it was completely contradicted by that of another witness. The testimony of Turkish must similarly be rejected for reasons we have previously articulated. [23] Thus, in light of Hamilton's testimony, we are persuaded that DeMartino and McDonnell were fully aware of the bogus nature of their trades prior to the time the Crude Oil Straddle was entered. Furthermore, even a casual review of the trading records by DeMartino or McDonnell, who were both professional commodity traders, would have revealed that: (1) The straddle differential in the Crude Straddle remained essentially the same, despite the fact that the prices in the legs of the straddle were constantly changing; (2) Hamilton was involved as a broker on every CI trade; (3) the majority of trades in the Crude Oil Market were straddles; and (4) there was virtually no trading in the market during the nearby months. The combination of these facts suggests that even if petitioners did not specifically know prior to their investment that the Crude Oil Market was rigged, they certainly had reason to question the validity *387 of the Crude Oil Straddle during the time it was maintained. As such, we are convinced that petitioners has failed to meet their burden of proof on this issue and therefore respondent's determinations must be sustained. IV. Section 6013(e)
The final issue that we must resolve is whether Elizabeth DeMartino ("Elizabeth") or Elaine McDonnell ("Elaine"), or both, are relieved from liability under the provisions of section 6013(e). [24]
Section 6013(e), [25] provides that a spouse who filed a joint Federal income tax return may be relieved of liability for an underpayment of income tax if certain requirements are met. In order to qualify for relief under this so-called innocent spouse provision, the spouse must prove that: (1) A joint return was filed; (2) there was a substantial understatement *388 of tax on the return attributable to grossly erroneous items of the other spouse; (3) he or she did not know or have reason to know of the understatement; and (4) taking into account all facts and circumstances, it is inequitable to hold him or her liable for the deficiency. Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971); Sec. 6013(e). When examining section 6013(e) it is important to note that the section is remedial, and as was explained by the Fifth Circuit Court of Appeals, "Congress intended the [innocent spouse] exception to remedy a perceived injustice, and we should not hinder that praiseworthy intent by giving the exception an unduly narrow or restrictive reading." Sanders v. United States,509 F.2d 162, 166-167 (5th Cir. 1975). (Fn. ref. omitted.) *389 The parties do not dispute that the first two requirements of section 6013(e) have been met. [26] They disagree, however, as to whether there has been compliance with the latter two requirements. With respect to the third requirement, the standard to be applied is whether the spouse knew or whether a reasonably prudent person, possessed of the same experience and temperament, would have known of the understatement of tax. Sanders v. United States,supra at 165, 167; Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). Applying this standard to the facts before us, we note that Elizabeth testified *390 that the income tax return for the 1975 taxable year was signed by her husband for her in his continuing capacity as financial manager of the marriage. Elizabeth was a credible witness who provided reliable testimony; thus, in light of her testimony, we do not believe that she had actual knowledge of the understatement of tax on the return. We are also convinced that Elaine did not have actual knowledge of the understatement of tax on the return in question. As we have found, neither spouse had actual knowledge of the understatement of tax on the returns. Knowledge of an understatement may be imputed to a spouse, however, if a reasonable person under the circumstances of the taxpayer could be expected to know of the understatement. Sanders v. United States,supra;Terzian v. Commissioner,supra;Mysse v. Commissioner,supra.This Court has found at least three factors to be significant in determining whether a spouse has reason to know of an understatement of tax: (1) The presence of unusual or lavish expenditures, Mysse v. Commissioner,supra at 699; *391 (2) participation in business affairs or bookkeeping by the alleged innocent spouse, Quinn v. Commissioner,62 T.C. 223 (1974), affd. 524 F.2d 617 (7th Cir. 1975); and (3) the guilty spouse's refusal to be forthright concerning the couple's income, Adams v. Commissioner,60 T.C. 300 (1973). [27]
Looking to the instant matter, we see two families whose standard of living was reasonably high but substantially unchanged during the year in issue. [28] Elizabeth and Elaine both lived in high-priced houses in affluent neighborhoods and their husbands drove expensive cars, yet not one of these assets was acquired in 1975. [29] During that same year, there were no expenditures for extravagant gifts, extensive vacations, or country club memberships, and the children of each family continued to attend public schools. In short, it does not appear from this record that 1975 was a year of lavish or unusual spending by either petitioner. *392 The business affairs of Elizabeth and Elaine were conducted entirely by their husbands. Elizabeth and Elaine are high school graduates who spent their time occupied as housewives during the year in issue. The extent of each spouse's participating in financial matters was to pay the household bills. For this purpose each of these women had her own checking account into which their husbands would periodically deposit money. Each spouse presumed, as would women of similar experience and temperament, that their husbands would properly complete their Federal income tax returns. Neither wife had any knowledge of the commodity trading business, nor was commodity trading, or the specific trades involved, ever discussed at home by their husbands. Although there may not have been any untruthful information concerning the deductions for commodity losses provided by the husbands to their wives, the latter, with their lack of sophistication in commodity trading, could not have been expected to make any relevant inquiries as to the validity of the claimed losses. The sham nature of the deductions was effectively concealed from the wives due to the extremely intricate nature of the transactions. *393 In sum, we are persuaded that neither Elizabeth nor Elaine knew or had reason to know of the understatement of income tax. Turing to the fourth requirement of section 6013(e), we are asked to determine whether it is inequitable to hold Elizabeth or Elaine liable for the deficiencies attributable to the understatements. In making this determination, a factor to be considered is whether the person seeking relief significantly benefited from the understatement. [30] See sec. 1.6013-5(b), Income Tax Regs.[31]
*394 In the instant matter, Elizabeth and Elaine did not significantly benefit from the understatements of income tax. Though these spouses did enjoy a reasonably high standard of living, a significant benefit does not exist where the income resulting from the understatement is used primarily for the normal support of the family. See sec. 1.6013-5(b), Income Tax Regs.; Terzian v. Commissioner,supra at 1172; Mysse v. Commissioner,supra at 698-699. Here, as we previously stated, we fail to see to any lavish or unusual expenditures during the year in issue, or any noticeable change in the families' life styles during that year. [32]
After a review of the facts and circumstances of this case, and in light of our finding that neither Elizabeth nor Elaine significantly benefited as a result of the understated income, we conclude that it would be inequitable to charge either wife with the tax liabilities incurred by their *395 husbands. Consequently, Elizabeth and Elaine are entitled to relief from liability under the provisions of section 6013(e). To reflect the foregoing, as well as concessions, Decisions will be entered under Rule 155.
Footnotes
1. These cases were consolidated pursuant to an Order of this Court dated March 12, 1985.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. Division A of the Deficit Reduction Act of 1984, 98 Stat. 494.↩
4. Explained infra.↩
5. A more detailed description of the terms and mechanics of commodity futures trading may be found in Perlin v. Commissioner,86 T.C. 388 (1986); Miller v. Commissioner,84 T.C. 827, at 828-830 (1985), on appeal (10th Cir., Nov. 20, 1985); Smith v. Commissioner,78 T.C. 350, at 354-357 (1982); and Landreth v. Commissioner,T.C. Memo. 1985-413↩. 6. An "offset" constitutes the execution of an equal and opposite transaction to the position which was established earlier; the offsetting position and the earlier position are then both eliminated. For example, a seller offsets a short position in a given number of future contracts by buying a long position in the same commodity for the same number of contracts and for the same delivery month.↩
7. A straddle may be achieved in one of two ways: (1) By trading each leg, separately (e.g., taking a long position in March 1976 crude oil and a short position in June 1976 crude oil); or (2) by taking both positions in one simultaneous transaction. See Perlin v. Commissioner,supra↩ at n. 9.
8. Open commodity futures positions (i.e. either outright or straddle positions which have not been offset) are "marketed to market" by the clearing house at the close of each trading day. By use of the mark to market system, the clearing house compares the actual prices paid for the futures contracts, to settlement prices fixed by the exchange. The settlement prices are set daily and are generally somewhere in the range of prices traded near the close of trading. The maintenance margins required by the clearing house change, depending on whether the settlement price of a particular position has changed from the settlement price for the previous day. If the price of the position has "settled" in favor of the trader, his account will be adjusted accordingly and he will be able to draw out his profit in cash the next day. If the price of the position has settled against the trader, he is required to deposit additional margin the next day. These cash adjustments take place even though the position has not been offset. See Perlin v. Commissioner,supra n. 12; Miller v. Commissioner,supra n. 9; Smith v. Commissioner,supra↩ at 356.
*. Claimed on 1975 tax return as short-term capital loss↩
*. Claimed on 1976 tax return as short-term capital gain↩
9. See explanation infra,↩ note 14, and accompanying text.
10. We must resolve this issue before we can consider the applicability of sec. 108 of the Tax Reform Act of 1984. Perlin v. Commissioner,supra;Miller v. Commissioner,supra at 845; Q&A-2 of sec. 1.165-13T, Temporary Income Tax Regs., T.D. 7968↩, 49 Fed. Reg. 33444 (Aug. 21, 1984).
11. Noncompetitive trades are allowed only in certain limited situations, none of which were involved in the instant matter. See 17 C.F.R. sec. 1.38(1985)↩. 12. As is indicated in our findings, supra,↩ the rules of the Petroleum Associates contained similar requirements concerning trading by competitive open outcry.
13. Rule C 27.(2) of the Petroleum Associates bylaws, which is set forth in our findings, requires, inter alia, that if a member of the exchange handles both sides of one transaction, he may do so only in the presence of an official representative of the exchange who has been designated by the exchange to observe such transactions. As Table No. 1 indicates, Hamilton was often the broker for both sides of a CI trade; yet, the record is devoid of evidence as to whether these transactions were executed in the presence of an exchange official. ↩
14. An "ex-pit" transaction is a transaction executed outside of the trading ring. These transactions, which were authorized by the rules of the Petroleum Associates during the year in issue (see Rule C14, 5(a)-(d) of our findings, supra↩), are allowed in limited situations, for example, where a brokerage firm exceeds its clearing limit, or where the clearing member who executed the trades subsequently dies before the trades have been properly cleared. 15. Petitioners contend that Hamilton's testimony must be rejected since Hamilton testified that the ex-pit trade cleared on September 19, 1975, but the trade was actually arranged by DeMartino and cleared on September 30, 1975. This contention is without merit. Hamilton, in fact, testified that he could not specifically recall when the trade cleared. The clearing records reflect that the 25-contract ex-pit cleared on September 30, 1975. In any event, we are not concerned with the exact date the trade cleared. The point is, that as Hamilton testified, and as the records reflect, a 25-contract ex-pit occurred shortly after, and in connection with, the September 17 and 18 CI trades.↩
16. Turkish testified that it was not possible to prearrange trades in the market; yet, he was convicted by a jury in the Southern District of New York Doc. No. (S) 78-00251-01 V.L.B. on October 19, 1977, of evading income taxes and filing false income tax returns in violation of secs. 7201 and 7206, and of conspiring to defraud the United States, 18 U.S.C. sec. 371, as a result of being involved in a conspiracy to fix, rig, and prearrange commodity future transactions in the Crude Oil Market. Said conviction was upheld on appeal in United States v. Turkish,623 F.2d 769 (2d Cir. 1980), cert. denied 449 U.S. 1077 (1981). He was also banned from trading in futures contracts, and fined $50,000 for his participation in said conspiracy, by the CFTC. In the Matter of Norman Turkish,↩ CFTC Docket No. 80-5 (August 19, 1982).
17. As is indicated in our findings, of the 55,000 trades executed in the Crude Oil Market, 37,000 or 67 percent of these trades were straddles. Both Hamilton and Blitzer testified that almost all of the remaining 18,000 trades were executed by Hamilton as wash sales. A wash sale is defined as a purchase and sale of the same contract at the same time for the same price which results in no profit or loss to the trader. Apparently, wash sales were used during the early stages of the Crude Oil Market to artificially inflate the volume of contracts traded, which in turn was supposed to make the market more attractive to outside investors.↩
18. See also Rule C14.(15) of the Petroleum Associates bylaws, which provides that in inactive futures markets, the contract prices must bear a reasonable relationship to the prevailing market prices of active futures markets. No such evidence was presented by petitioners.↩
19. The contention by petitioners that they had no knowledge or reason to know of the defective nature of their transactions is irrelevant. See Lynch v. Commissioner,273 F.2d 867, at 872 (2d Cir. 1959), wherein it was stated: "Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of the individual taxpayers." Accord Dooley v. Commissioner,332 F.2d 463, 468 (7th Cir. 1964); Green v. Commissioner,331 F.2d 470, 473 (6th Cir. 1964); Nichols v. Commissioner,314 F.2d 337, 338 (5th Cir. 1963); MacRae v. Commissioner,294 F.2d 56, 59 (9th Cir. 1961). Having resolved the first issue in favor of respondent, we need not reach petitioners' contentions with respect to sec. 108 of the Tax Reform Act of 1984.↩
20. The exact date of the meeting is somewhat unclear. DeMartino and Turkish both testified that it occurred sometime in February 1975. McDonnell testified that the meeting took place during late winter in 1975. Hamilton, however, testified that he was quite certain that the event happened in May 1975, because it was shortly before his son left for Europe, which was in June of that same year. Regardless of the actual date of the meeting, it is important to note that each of the people who testified, agreed that it did occur prior to the time the Crude Oil Straddle was established. There is also some ambiguity as to who actually was present at the meeting. The parties agree that the meeting was attended by at least the four people mentioned above, but Hamilton testified that his son Marshall was also in attendance. Marshall Hamilton was not called to testify at trial. ↩
21. CI's records reflect that Marshall Hamilton opened a trading account with CI on April 25, 1975, and that on May 22, 1975, he filled out an application form at CI for a position entitled "associated person." ↩
22. In this regard, Hamilton testified as follows: Q During the course of this meeting, you discussed crude oil feature's [sic] trades? A Correct. Q Did you discuss straddle trades? A Yes. Q For what purpose? A For the purpose of tax straddles. Q Did you have discussions concerning risk associated with those transactions? A Yes. Q And did you state what the risk was with those transactions? A No risk. Q That was what you told everyone at this meeting? A Right. * * * Q Did you tell them why, yes or no, why there was no risk? A Yes. Q What did you tell them? A I told them that I controlled the market and they don't have to worry, whatever has to be done will be done.↩
23. See note 16, supra.↩
24. On March 20, 1985, this Court granted petitioners' motions to amend their petitions to assert the application of sec. 6013(e)↩ with respect to petitioner Elizabeth DeMartino in docket No. 6351-81 and petitioner Elaine C. McDonnell in docket No. 6352-81.
25. Sec. 6013(e)↩ was amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801 (1984-3 C.B. (Vol. 1) 309). Said amendment has retroactive application to all taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. See H. Rept. 98-432, Pt. 2 1501, 1503 (Mar. 5, 1984).
26. The scope of sec. 6013(e) was expanded by the Tax Reform Act of 1984, so as to include not only omissions from gross income but also any claim of a deduction, credit, or basis for which there is no basis in fact or law. We are of the opinion that the claimed deductions for losses resulting from the Crude Oil Straddle had no basis in fact or law. Cf. Douglas v. Commissioner, 86 T.C.     (Apr. 21, 1986); Shenker v. Commissioner,T.C. Memo. 1985-301↩.
27. See Walker v. Commissioner,T.C. Memo. 1985-278↩.
28. As was stated by the Fifth Circuit Court of Appeals, in Sanders v. United States,509 F.2d 162, 168↩ (5th Cir. 1975), "One person's luxury can be another's necessity, and the lavishness of an expense must be measured from each family's relative level of ordinary support." (Fn. ref. omitted.)
29. See Quint v. Commissioner,T.C. Memo. 1985-226↩.
30. Sec. 6013(e)(1)(C), prior to its amendment, explicitly required that we consider "whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income." While sec. 6013(e), as amended, no longer specifically requires that we make such a determination, this factor is still to be taken into account. See H. Rept. 98-432, Pt. 2 (March 5, 1984), supra at 1502; Walker v. Commissioner,supra at n. 3; Quint v. Commissioner,supra↩ at n. 7. 31. These regulations were promulgated prior to July 18, 1984, the effective date of present sec. 6013(e), which no longer includes a specific reference to a significant benefits test. But cf. n. 31, supra.↩
32. It is also significant that Elaine and her husband were divorced subsequent to the time the 1975 tax return was filed. See sec. 1.6013-5(b), Income Tax Regs.↩