Mary W. LASKER, Plaintiff-Appellant,

v.

BEAR, STEARNS & CO.,
Defendant-Appellee.

No. 631, Docket 84–7785.

United States Court of Appeals,
Second Circuit.

Argued Jan. 17, 1985.

Decided March 1, 1985.

P. Kevin Castel, New York City (Cahill, Gordon & Reindel, John R. Young, Kathleen E. McKay, Howard N. Henick, New York City, of counsel), for plaintiff-appellant.

David W. O'Connor, New York City (Gersten, Savage, Kaplowitz & Simensky, Paul J. Giacomo, Jr., New York City, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and MANSFIELD Circuit Judges.

---

FEINBERG, Chief Judge:

Plaintiff Mary W. Lasker appeals from a judgment of the United States District Court for the Southern District of New York, entered after a bench trial before John M. Cannella, J. The district judge found defendant-appellee Bear, Stearns & Co. liable for $6,487 plus interest on appellant's suit for breach of contract, common law fraud, and violations of the Commodity Exchange Act (CEA), 7 U.S.C. §§ 1–24 and N.Y.Gen.Bus.Law §§ 351 and 352–c. However, the judge refused to award appellant either punitive damages or certain consequential damages. It is from this refusal that appellant appeals. For the reasons stated below, we affirm.

### I. FACTS

In December 1975, appellant opened a commodities account with appellee brokerage firm. This account was placed in the charge of Norman Turkish, a limited partner in the firm and manager of its commodities trading department. Shortly thereafter, Turkish caused certain purchases and sales to be made on appellant's behalf in the crude oil futures market of the New York Cotton Exchange. The effect of these transactions was to place appellant in a "straddle" position in that market.

Some appreciation of how a commodity straddle works is needed to understand the factual setting of this case. For simplicity, we will assume away certain complications that are irrelevant here, and we will speak of single futures contracts when referring to transactions that ordinarily involve far larger numbers, as they did in this case.

To create a straddle, a trader purchases a futures contract, which obliges him to accept in a designated future month delivery of specified amounts of a particular commodity at a set price; this is the "long" side of the straddle. Simultaneously, the trader sells a futures contract that commits him to deliver a like quantity of the same commodity at the same price, but in a different month; thus, he establishes a corresponding "short" position.[1] Having achieved both "legs" of the straddle, the trader must then await movement in the futures market for the chosen commodity. Whichever direction prices go, one leg of the trader's straddle is likely to appreciate in value, and the other leg to depreciate; such is the nature of the corresponding positions. The change in prices will have a net economic effect upon the trader to the extent that the gain on one leg of the straddle does not precisely offset the loss on the other; the fact that his positions are in different months may make him subject to the different effects of storage and insurance costs, interest rates and other factors. However, many traders establishing straddles appear to do so less in search of actual economic gain than in an effort to obtain certain tax benefits.

Once the trader has established his straddle, he may gain these tax benefits by executing two additional transactions. First, he must "close," or liquidate, the futures contract comprising the straddle leg that has fallen in value. If the leg to be closed is a long position, he must sell a futures contract requiring delivery in the same month as that designated in the contract to be closed; if the leg is short, a purchase of an identical contract will have that cancelling effect. As a result, the trader will immediately realize what is usually a short-term capital loss. This loss can then be used to offset unrelated capital gains on which the trader would otherwise have had to pay taxes during the current year. At the same time, to "lock in" his as yet unrealized gain from the appreciation of the unclosed leg of the straddle, the trader must also acquire another futures contract in the same commodity, but for yet another month. If the unsold position is "long," the new position must be short,

---

1. As will be seen, a trader interested in avoiding risks would prefer to take both his long and his short positions in the same month. However, commodity exchange rules and tax provisions that deem such offsetting positions to cancel each other out force the trader seeking tax benefits to establish each leg of his straddle in a different month. *Smith v. CIR*, 78 T.C. 350, 363 (1982).

and vice-versa. Any diminution of the un-realized gains will therefore be balanced by the gains of the newly acquired position. Once protected, the unclosed straddle leg can be held until the following calendar year, at which time the trader can liquidate both of the remaining positions and realize a short-term capital gain, or, under certain circumstances, a long-term capital gain. See 26 U.S.C. § 1233(b).

A commodity straddle, even when it has resulted in no net economic effect, thus allows a trader to postpone the taxes on some amount of short-term capital gains. The magnitude of this tax benefit is, of course, dependent on the extent to which prices have fluctuated in the relevant fu-tures market. The more volatile the mar-ket, the greater will be the depreciation of the straddle leg that is closed in the initial year, and the greater will be the amount of tax liability (on current unrelated short-term capital gains) that is "moved" into the following tax year. But, as this court pointed out in *United States v. Turkish*, 623 F.2d 769 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981): "In normal transactions the trader takes the risk that market price movements will be too narrow to create much opportu-nity for tax postponement and also the more serious risk that prices will not move uniformly with respect to both his original contracts. In the latter event the profit available to be locked in may be less than the locked-in loss." *Id.* at 770. For more detailed discussions of commodity strad-dles, see generally *Smith v. CIR*, 78 T.C. 350, 362–65 (1982); Note, The Tax-Straddle Cases, 1982 Duke L.J. 114, 116–25; Note, Commodity Straddles as an Income Shelter-ing Device, 31 Okla.L.Rev. 233, 235–39 (1978).

In this case, however, all was not right in the crude oil futures market at the time appellant entered it. There were those who were not content simply to await the price fluctuations needed for tax deferral or to take the risk that they would not occur. In order to ensure that an oil com-pany would be able to postpone taxes on very substantial capital gains, a group of traders, including Turkish, endeavored—apparently with considerable success—to fraudulently manipulate "virtually the en-tire business" of the crude oil futures mar-ket of the New York Cotton Exchange. *United States v. Turkish, supra*, 623 F.2d at 770. Some time thereafter, Turkish and his co-conspirators became the targets of investigations that culminated in the feder-al indictment of Turkish and three co-de-fendants. Turkish was convicted of evad-ing income taxes and filing false income tax returns, 26 U.S.C. §§ 7201, 7206, and conspiring to defraud the United States, 18 U.S.C. § 371.

Because her tax returns showed transac-tions in crude oil futures during the period in which fraud had been uncovered, appel-lant became the subject of an audit by the Internal Revenue Service (IRS) in 1979. While appellant had nothing to do with the market manipulation, she clearly had bene-fited from the collusive price movements. Her straddle position had allowed her to claim a short-term capital loss of $108,979 in her 1975 return and a short-term capital gain of $102,492 in her 1976 return. The 1975 loss allowed her to postpone taxes on certain unrelated short-term capital gains that she had realized that year. In Novem-ber 1980, the IRS disallowed both the 1975 loss and the 1976 gain "since the [crude oil futures] market was rigged to generate fictitious losses." The effect of disallow-ance of the 1975 loss was to increase appel-lant's tax liability for that year. However, the disallowance of her 1976 gain did not have a balancing positive tax impact be-cause appellant had made a large charita-ble contribution in 1976 that had offset the 1976 gain. Following the IRS audit, the results of which were reported to state and local authorities, appellant had to pay $63,-681.80 in additional federal, state and local taxes, and interest charges.

In November 1981, appellant filed this action against appellee, alleging violations of the CEA, breach of contract, common law fraud and violations of N.Y.Gen. Bus.Law §§ 351 and 352–c. Her amended complaint sought damages in excess of

$70,000, representing both "her payment of additional city, state and federal tax assessments which she would not have been obligated to pay if the transactions in question had been lawfully and legitimately effected" and her out-of-pocket loss of the payments she had made to cover margin requirements and commissions. She also sought punitive damages on her breach of contract and common law claims.

Following a bench trial, Judge Cannella found appellee liable on the theory of *respondeat superior,* and awarded appellant $6,487 plus interest for her out-of-pocket losses. Citing *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng.Rep. 145 (1854), however, the district court refused to award appellant damages based upon her lost tax benefits, holding principally that these damages were neither "contemplated by the parties" nor "reasonably foreseeable" by them. Alternatively, the district court held that appellant was not entitled to recover her lost tax benefits because "she has not established that she entered into these transactions with the requisite profit motive." The court also denied appellant's claim for punitive damages. The only aspects of this judgment that are before us on appeal are the court's refusal to recognize these two damage claims.

### II. DISCUSSION

In this court, appellant first argues that under the rule of *Hadley v. Baxendale, supra,* and its progeny, *see Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80, 83 (2d Cir.1961), she should be permitted to recover the value of her lost tax benefits as damages for breach of contract. The evidence, she maintains, showed tax benefits to have been plainly contemplated by the parties to her contract with appellee, even if the precise amount of those benefits might not have been foreseen by appellee or its agent Turkish. Appellant also contends that her CEA claim, which, she argues, permits recovery of damages proximately caused by appellee's violation without requiring a showing of foreseeability, supports recovery of her lost tax benefits

because she "established with reasonable certainty what her tax benefits would have been absent [Turkish's] fraud." Noting that the only reason given by the IRS for disallowing her losses and gains was the rigging of the crude oil futures market, she argues that absent such manipulation, these would not have been disallowed.

■ We agree with the result reached by the district court, but affirm on a somewhat different theory. Even if we were to accept appellant's theories of recovery to the extent of allowing her whatever tax benefits she would have received absent the fraud, we would have to reject her damage claim as speculative and wholly unsupported by the record. Under any of appellant's theories, the measure of damages is the difference between appellant's actual tax liability following the IRS audit and the liability to which she would have been subject had her commodity straddles been executed in an unrigged market. Yet appellant adduced no evidence as to how her crude oil futures positions might have fared in such an unrestrained market. Her failure in this regard is critical since there is a real risk in an unrigged market that a tax straddle, although properly executed, will produce no tax benefits: If the price movements in the market are small, the losses and compensating gains created on the legs of the straddle may not be large enough to produce a tax deferral of any value; if the market is stable there will be no tax benefit at all from the straddle. See *United States v. Turkish, supra,* 623 F.2d at 770.

Testimony given at Turkish's criminal trial and introduced by appellant here indicated that "tens of thousands" of crude oil futures transactions were rigged during the criminal conspiracy and that "less than ten" were not. In addition, the evidence at the criminal trial showed that, despite great fanfare in initiating a futures market in crude oil on the New York Cotton Exchange, virtually no trades were made during the month the market was open before the conspirators began trading. Under the circumstances, it is highly unlikely that

there ever was a real market for crude oil futures during the period in question; the whole basis of the rigging conspiracy was the ability of certain brokers to move futures prices at their "whim." Without price movements, appellant could never have gained any tax benefits at all, let alone the substantial benefits whose value she now seeks. Therefore, her failure to show that any such movement might have occurred absent the conspiracy is fatal to her claim. Appellant correctly points out that a defendant ordinarily "must bear the risk of uncertainty created by its conduct" where its breach of contract "has made difficult a more precise proof of damages," *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 455 (2d Cir.1977). But a plaintiff must always bear the burden of demonstrating that there were at least some damages. Here, appellant failed to come forward with any evidence to meet this burden with respect to her lost tax benefits.

■ To be sure, it does not appear that appellant specifically chose to purchase crude oil futures. The commodity straddle she sought might well have been executed in another trading ring; the choice seems to have been Turkish's. In this court, appellant has quite reasonably argued that if she had been aware of Turkish's illegal scheme, she would have invested in some other commodity futures that might have produced tax benefits. However, there is nothing in the record to show what, if any, tax benefits appellant might have gained through these hypothetical trades. In sum, appellant failed to sustain her burden of proving any actual damages other than the $6,487 out-of-pocket losses awarded her by the district court.[2] Furthermore, we cannot say that in refusing to award punitive damages on appellant's common law claims, the district judge as the trier of fact abused the wide discretion allowed to him

by New York law. *Cf. Flaks v. Koegel*, 504 F.2d 702, 706–07 (2d Cir.1974).

The judgment of the district court is affirmed.

---

2. Because we find that appellant failed to meet her burden of showing that she would have received any short-term gains or losses in the absence of the illegal rigging of the crude oil futures market, we need not reach the question whether she met the requirements of *Smith v. CIR, supra,* and § 108 of the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, 630 (1984), see H.R.Rep. No. 861, 98th Cong., 2d Sess. 917, with respect to profit motivation.