UNITED STATES of America, Plaintiff,

v.

Charles Agee ATKINS, William S. Hack and Ernest M. Grunebaum a/k/a "Mike", Defendants.

No. SS 87 Cr. 246 (EW).

United States District Court, S.D. New York.

June 2, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for the U.S.; Stuart E. Abrams, Jordan Stanzler, Asst. U.S. Attys., of counsel.

Herrick, Feinstein, New York City, for Charles Agee Atkins; James A. Moss, Christopher J. Sullivan, of counsel.

Grand & Ostrow, New York City, for William S. Hack; Paul R. Grand, Lawrence S. Bader, of counsel.

Anderson Russell Kill & Olick, P.C., New York City, for Ernest M. Grunebaum; John H. Doyle, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Defendants Charles Agee Atkins ("Atkins"), William S. Hack ("Hack") and Ernest M. Grunebaum ("Grunebaum") move pursuant to Fed.R.Crim.P. 12(b)(2) to dismiss the indictment, containing conspiracy and substantive counts, on the ground that no prosecutable offenses are alleged.

Count 1, the conspiracy count, charges that the defendants, as well as persons known and unknown, combined and conspired to defraud the United States of America and the Internal Revenue Service in the ascertainment, assessment and collection of taxes due the Government.[1] Counts 2 through 31 charge the defend-

---

1. 18 U.S.C. § 371.

ants, or combinations of them, with substantive violations in that the defendants wilfully: (1) subscribed to false partnership tax returns, and, in the case of Atkins and Grunebaum, false personal tax returns; [2] and (2) aided or assisted in the preparation of false tax returns of limited partners.[3]

According to the indictment, defendant Atkins was a general partner in four New York limited partnerships that he formed and promoted and in which he acted as a broker-dealer in money market instruments providing significant tax benefits to limited partners. It is further alleged that defendant Hack was an attorney and a tax shelter promoter and that defendant Grunebaum was the head of one of the limited partnerships' divisions and the part owner and officer of a family corporation, which allegedly engaged in fraudulent transactions generating false trading losses and false interest expenses.

The indictment alleges that the goal of the conspiracy was, through pre-arranged, rigged and fraudulent transactions in United States government and agency securities, to create false tax deductions based on fraudulent trading losses and interest expenses that were passed on to the limited partners. The defendants are charged with causing the issuance of fraudulent sales literature that misrepresented the nature of their operation; using secret oral agreements to disguise the true nature of their transactions; creating shell corporations to carry on transactions; paying disguised kickbacks; concealing the true nature of their business from outside auditors; and causing false returns to be filed with the Internal Revenue Service. It is further alleged that various transactions were back-dated to generate greater losses, and the "secret oral agreements" were hidden from the limited partnerships' outside auditors.

In broad terms, however variously stated, the essence of the charges is the creation, through fraudulent means, of fictitious trading losses and interest expenses which were passed on to the limited partners who claimed tax deductions in their individual tax returns, thereby impeding the Government in the assessment and collection of hundreds of millions of dollars in taxes properly due from the limited partners. Similar charges are made against the defendants with respect to the partnership, and in the case of Atkins and Grunebaum personal, tax returns.

*The Motion to Dismiss the Indictment*

In support of their motion to dismiss the indictment, defendants make three arguments: (1) that the transactions mentioned in the indictment were arguably legal when they were performed; thus, it would violate due process for the government to prosecute them under ambiguous laws; (2) that the Tax Reform Act of 1986 grants legislative amnesty for the conduct alleged in the indictment; and (3) that New York's Statute of Frauds would prevent enforcement of secret oral agreements not reflected in the trading confirmations; therefore, they could not have completely eliminated the possibility that the transactions would result in a gain.

Preliminarily, it is noted, as the defendants acknowledge, that the factual allegations of the indictment must be accepted as true.[4] Another principle applicable on this motion, stated in the much cited case *Costello v. United States*,[5] is that an indictment "if valid on its face, is enough to call for a trial of the charges on the merits." [6] While acknowledging that the motion to dismiss the indictment must be decided within the four corners of the document, defendants have submitted an affidavit, sworn to by defendant Atkins, in support of their motion. Reference is made to this affidavit only for the purpose of giving

---

**2.** 26 U.S.C. § 7206(1).

**3.** 26 U.S.C. § 7206(2).

**4.** *United States v. Barta*, 635 F.2d 999, 1002 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981).

**5.** 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

**6.** *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956).

context to their legal arguments; otherwise, the basis of their motion would be incomprehensible.

Atkins states that the events referred to in the indictment concern the tax consequences of TSGS's, one of the four partnerships named in the indictment, trading activities in United States Government and federal agency securities in the cash, futures and forward markets; that all such transactions were recorded on trading tickets and confirmations sent to the counterparties; that these trading tickets recorded the identity of the parties to the transaction; a description of the securities traded; the quantity and price of the securities; the date of the trade and the financing cost of the transaction. Based on this information, TSGS's independent accountants prepared the firm's tax returns, and conducted seven audits. Atkins further states that he signed the tax returns after accountants assured him that the returns were true and correct. Absent from Atkins's affidavit is any reference to the charge in the indictment that secret unwritten information was hidden from the accountants and was not reflected in any trading ticket.

The defendants assert that the indictment is based primarily upon the government's theory that the applicable law prevents the deductibility of trading losses generated by transactions not entered into for profit.[7] They contend that the government's legal theory is wrong as applied to the partnerships and to their partners and accordingly the indictment should be dismissed.

The defendants portray themselves as procurers of legitimate "tax straddles"—commodities transactions entered into for the sole purpose of realizing a tax loss. The basic legal question, they argue, is whether "loss legs of future straddle transactions could [ ] be closed out and recognized for tax purposes without simultaneously recognizing the unrealized gain

from the gain legs."[8] Defendants also contend that it is not illegal to enter into transactions to eliminate the prospect of gain, which is all they maintain the indictment alleges.

Apparently, the commodities tax straddle was a popular tax shelter technique during the years referred to in the indictment. A straddle transaction involves an individual taking two or more positions calling for the purchase of a specified commodity in one or more months and for the sale of the same commodity in one or more different months. Each position is referred to as a "leg" of the straddle. In tax straddles, customarily the loss leg of the straddle is closed out in order to realize a tax loss and a similar position acquired in a different month so that the economic consequences and risks to the holder are minimized. This substitution is referred to as a "switch."[9]

In the commodities market,

[e]very position held by a person is matched by an exactly opposite position (or series of positions) held by one or more other persons. Thus, a loss realized on a closeout will be matched by the realization of a gain in the same amount, provided the opposite position was acquired at the same time and held to closeout.[10]

As such, it is the nature of the market to generate *some* taxable gain. Even where an investor enters into the commodities market with an eye toward realizing a tax loss, he will eventually have to report a gain on the gain leg of the transaction. There are some situations where the investor runs the risk that the spread between his positions will remain constant, with neither leg of the straddle becoming a loss leg.

None of the foregoing obtains when the commodities transactions are prearranged or bogus, the type of transactions the

---

7. Atkins Memorandum of Law at 4.

8. Atkins Memorandum of Law at 29.

9. *Miller v. Commissioner,* 84 T.C. 827, 828–29 (1985). *See generally Lasker v. Bear, Stearns & Co.,* 757 F.2d 15, 16–17 (2d Cir.1985); *Commodi-*

*ty Exchange, Inc. v. Commodity Futures Trading Commission,* 543 F.Supp. 1340, 1342 (S.D.N.Y. 1982), *aff'd,* 703 F.2d 682 (2d Cir.1983).

10. *Miller,* 84 T.C. at 830.

Government alleges here. In a bogus arrangement, there is absolutely no risk that the desired loss will not be realized. Additionally, there will never exist a taxable gain to correspond to the reported tax loss. As the government states, courts have consistently disallowed the intended tax effects of transactions "without an economic effect, the only purpose of which was tax avoidance." [11] Against this background, we address defendants' contention that, at the time the transactions mentioned in the indictment were entered into, the law was unclear whether losses derived from those transactions were deductible.

Generally, whether a given loss is tax deductible is governed by Section 165(c) of the Internal Revenue Code of 1954, which provides in part:

> Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—
>
> (1) losses incurred in a trade or business;
>
> (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.

Defendants concede that the losses generated by their activities are not deductible under § 165(c)(2), because the commodities transactions were not entered into for profit. However, defendants contend that § 165(c)(1), which applies to losses incurred in a trade or business, but contains no explicit requirement that the losses be incurred in a profit-seeking transaction, allows for the deductibility of the tax losses they assert they were in the business of generating. In other words, defendants maintain that, because they made a "business" out of entering into commodities straddles for the purpose of generating tax losses, those losses are deductible. As such, they assert it is inconsistent with due process to prosecute persons for engaging in activities not clearly proscribed at the time they were performed.[12] The government disputes the defendants were involved in a "trade or business" within the meaning of § 165(c)(1), and contends that whatever "business" the defendants were involved in as alleged in the indictment was illegitimate.

■ Prior to the adoption of § 108 of the Tax Reform Act of 1984, which created a rebuttable presumption that commodities straddle transactions were entered into with a reasonable expectation of realizing a profit, and allowed tax deductions for losses incurred in all pre–1982 commodities transactions, an individual taxpayer was required to show that he had a nontax profit motive for his commodities investment.[13] While defendants have the advantage of this presumption, it is rebuttable; the government must be afforded the opportunity to rebut it. Section 108 does not allow tax deductions obtained from fictitious or bogus transactions.[14]

■ Defendants further argue that their conduct with respect to their partnership tax returns has been exonerated by the enactment of Section 1808(d) of the Tax Reform Act of 1986, which provides that losses from pre–1982 straddles are deductible "if such loss is incurred in a trade or business" without regard to whether the transactions were entered into for profit. That section contains a presumption that "any loss incurred by a commodities trade in the trading of commodities shall be

---

**11.** Government's Memorandum of Law at 5. *See United States v. Ingredient Technology,* 698 F.2d 88, 94–95 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *United States v. Winograd,* 656 F.2d 279, 282–83 (7th Cir.1981), *cert. denied sub nom., Siegel v. United States,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *Julien v. Commissioner,* 82 T.C. 492 (1984).

**12.** *See United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921).

**13.** *See Smith v. Commissioner,* 78 T.C. 350, 390–91 (1982) (existence of nontax profit motive a question of fact on which taxpayer bears burden of proof); *see also Fox v. Commissioner,* 82 T.C. 1001 (1984).

**14.** *Forseth v. Commissioner,* 85 T.C. 127 (1985), *aff'd sub nom. Enrici v. Commissioner,* 813 F.2d 293 (9th Cir.1987); *Brown v. Commissioner,* 85 T.C. 968, 1000 (1985); *DeMartino v. Commissioner,* 51 T.C.M. 1278, Dec. 43, 142(M), T.C. Memo 1986–263 (1986).

**496**

treated as a loss in a trade or business."
Again, this presumption is not available
where the trades are fictitious or prear-
ranged.[15] Moreover, it is not alleged in the
indictment that any of the defendants were
commodities traders.

Even accepting the defendants' con-
tention that losses from tax straddle trans-
actions entered into for the express pur-
pose of realizing a loss are deductible un-
der § 165(c), upon the allegations of the
indictment, a jury can find that defendants'
commodities straddles were sham transac-
tions devoid of the requisite economic sub-
stance.[16] Although § 165 allows a deduc-
tion for a loss sustained during a tax year
that is not compensated by insurance or
otherwise where such loss is incurred in a
trade, business or in a transaction entered
into for profit, the loss must be the result
of a bona fide transaction; substance, not
form, is the controlling factor.[17]

At no time, under any of the stat-
utes relied upon by the defendants, has
there been any question but that sham and
fictitious transactions, whether in the form
of straddles or other tax loss devices, do
not give rise to tax deductions. Here the
indictment clearly alleges that the transac-
tions referred to were sham, false, con-
trived and created by various manufac-
tured acts all for the purpose of defeating
the payment of proper income taxes due
from the partnership, the defendants and
the individual limited partners. If in fact
the transactions were carried out for the
purposes alleged, the defendants' fine-spun
argument suggesting a doubt existed as to
the deductibility of the tax straddle losses
is without substance.

Defendants' final argument, that
New York's Statute of Frauds [18] prevented

them from enforcing any secret oral agree-
ment and that their trading activity was
therefore legitimate and with economic ef-
fect, is specious. Simply because the se-
cret agreements might not have been en-
forceable in a court of law because of the
Statute of Frauds is irrelevant to the ques-
tion of whether or not those agreements
existed and were, in fact, complied with by
the parties. Moreover, "it would be high
irony to find that the defendants here are
immune to prosecution because they never
wrote [their agreements] down." [19] It is
not and has never been the law that losses
generated from bogus transactions, as
those alleged in the indictment, are legally
deductible. Defendants' motion to dismiss
the indictment is denied.

### Defendants' Discovery Requests

Defendants request a bill of particu-
lars, as well as identification of the govern-
ment's expert witness, the conspirators'
statements it plans to introduce at trial,
statements of witnesses that are exculpato-
ry of the defendants, and any summaries
the government will use at trial.

The request for a bill of particulars can
be broken three categories: 1) the nature
of the "secret oral agreements"—who en-
tered into them, where and when; 2) how
the defendants deceived the "outside audi-
tors", who those auditors are and when
they were allegedly deceived; and 3) how
the trades were "bogus", "fraudulent",
"pre-arranged" and "rigged", and whether
the government contends that there were
no securities underlying the transactions.

The government has already given de-
fendants a marked set of trade tickets rep-
resenting the trades in which it alleges

**15.** See Price v. Commissioner, 88 T.C. No. 47 (April 9, 1987) [Available on WESTLAW, FTX-CS database] (available on LEXIS, FEDTAX li-brary, CASES file); Glass v. Commissioner, 87 T.C. 1087 (1986).

**16.** See Perlin v. Commissioner, 86 T.C. 388, 414 (1986); see also United States v. Turkish, 458 F.Supp. 874, 887 (S.D.N.Y.1978); aff'd, 623 F.2d 769 (2d Cir.1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

**17.** See DeMartino v. Commissioner, 51 T.C.M. 1278, 1288 Dec. 43, 142(m), T.C. Memo 1986-263 (1986); see also Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Brown v. Commissioner, 85 T.C. 968, 998 (1985).

**18.** N.Y.Gen.Obl.L. § 5-701.

**19.** United States v. Ingredient Technology Corp., 698 F.2d 88, 95 (2d Cir.), cert. denied, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

secret oral agreements are involved. This information is more than adequate to supply defendants with all necessary evidence concerning the alleged secret agreements. Defendants also argue that they need to know the exact date, time, and location of the secret agreements so that each defendant may know whether he was present. As is well known, rarely is a conspiracy established by direct evidence. Usually it is based upon circumstantial evidence of acts and conduct of each conspirator involved. As noted in *United States v. Kahaner*,[20] "if the acts and conduct attributed to one conspirator were in furtherance of the claimed conspiracy during its existence, then it is immaterial whether or not other alleged co-conspirators were present or participated therein or had knowledge thereof."

The same rationale holds true as to the requests concerning the auditors. The defendants know the identities of the accounting firms involved, and the indictment outlines the nature of the concealment. The defendants know from the indictment the nature of the deception, and also know when they gave (or failed to give) information to its auditors. A bill of particulars would not assist defendants in learning the nature of the claims against them, but would only serve to allow them to learn of the government's evidence in advance of trial, or to restrict the government's proof upon the trial, improper objectives of a bill of particulars.[21] The defendants also seek to know the government's theory on how the trades were fraudulent, and definition of terms in the indictment. The government has already told defendants that the words in the indictment have their ordinary dictionary meaning. Any further discovery with respect to these terms would encroach on the government's right to preserve for trial the presentation of its evidence.[22]

With respect to the outstanding discovery requests, the government has already stated that it has no plans to call expert witnesses at trial, nor will it use scientific reports. Although the government states that it may call a witness with knowledge of the facts of this case who may also testify as an expert, the government is not certain that it will do so, and therefore cannot at this stage respond to the request. However, if the government does intend to call expert witnesses at trial it shall within a reasonable time before they testify supply in substance the nature of their expert opinions.

The government also represents that it will provide defendants with any exculpatory statements of which it has present knowledge, or learns of in the future. In its memorandum of law, the government states that it will provide exculpatory statements of "any witness." Defendants argue that they are also entitled to the statements of nonwitnesses who may have exculpatory information. Because the rule of *Brady v. Maryland*,[23] prohibits government suppression of *any* evidence favorable to the defense, the government is required to supply the defendants with the information requested. As to statements of co-conspirators, the government is not required to provide them because the defendants are on notice of the nature of the conspiratorial agreement.[24] Statements of witnesses or potential witnesses need not be produced to defendants in advance of trial. Such material is governed by 18 U.S.C. § 3500.

Finally, defendants seek any summaries or charts the government plans to use at trial. The government has provided defendants with the exhibits from which the summaries will be made; however, the defendants assert that they are entitled to the summaries themselves so that they may compare the data therein with the data in the exhibits. This is a legitimate request, and such information will avoid

**20.** 203 F.Supp. 78, 84 (S.D.N.Y.1962).

**21.** *See, e.g., United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974).

**22.** *Id.*

**23.** 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**24.** *See, e.g., United States v. Wilson*, 565 F.Supp. 1416, 1439 (S.D.N.Y.1983).

delay at the trial; accordingly, the request is granted.

The defendants' requests for a bill or particulars is denied because they already have ample information with which to prepare a defense, and to advance any claim of double jeopardy.[25] The discovery requests are also denied, except that the government is required to furnish all *Brady* material, summaries, and names and expert opinions of all expert witnesses it intends to call at trial. Counsel are requested to appear at the motion term of this Court on June 9, 1987 at 2:15 p.m. to set a trial date.

So ordered.

James E. Groves, Jr., Louisville, Ky., for plaintiff.

Nathan Goldman, Asst. Atty. Gen., Frankfort, Ky., for Ed Fossett.

Sue Simon, Dept. for the Blind, Frankfort, Ky., for McDowell and Seraglio.

---

**25.** *See, e.g., Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927).